Good morning, Your Honor. My name is Paul Quirt. I'm here this morning on behalf of Petitioner's Latino Issues Forum and Sierra Club, with me at Council's table is Deborah Reams. If I can, I'd like to reserve five minutes for rebuttal, but we'll see how it goes. Petitioner's here to challenge EPA's approval of San Joaquin Valley's Rule 4550. This rule attempts to control unhealthy particulate matter pollution caused by large agricultural sources. This rule is critical to cleaning the air pollution in the valley because agriculture is responsible for nearly 60 percent of the direct particulate matter emissions in the valley. EPA's approval of this rule is also important because EPA is the gatekeeper for ensuring that the requirements of the Clean Air Act are fulfilled. Rule 4550, however, does not do enough to fulfill the requirements of the Clean Air Act and EPA should not have approved it. The rule provides each source a menu of options and then requires each source to select one option from each of those menus. Petitioner's here focus on two defects in EPA's approval of this rule. First, EPA's approval was arbitrary and capricious because EPA has never shown that the rule requires sources to apply the best available control measures as required under Section 189B1B of the Act. Second, because the San Joaquin Valley has missed every deadline for meeting the national ambient air quality standards for particulate matter, the Clean Air Act requires sources to do more than just apply the single best available control measure. Sources in these areas must be required to implement all feasible measures. EPA, however, has refused to insist that Rule 4550 meet the all feasible measure standard. How is this case different from Vigil versus Levitt if I'm pronouncing that correctly? Well, even if I'm not, how is it different from that case in a way that would cause us to reach a different result? In that case, and I also don't know how to pronounce it, I say Vigil, petitioners argued that the best available control measure requirement required the implementation of all feasible measures. And the legal question there, the petitioners there argued that the requirement of the Clean Air Act for moderate non-attainment areas was that all reasonably available control measures be implemented. And that now that that area had been re-designated to serious, it was required to do best available control measures. And so petitioners said, well, it must be all best available control measures, and pointed out that the menu of options included multiple feasible measures, and so all of those measures should be required. The court there said, no, best available control measures, that requirement does not, in fact, require the implementation of all feasible measures. And the court was clear to point out that this was a purely legal question that was being raised, and that petitioners were not challenging any particular practice included in those menus as back-up. Petitioners here. So if I understand your argument, it is that you agree that as a matter of law, you can't require the whole menu as distinct from one of each, but here as a matter of fact, they should have. Is that what you're saying? No. No, I'm misunderstanding you. Yeah. So what we're saying, we aren't challenging that determination in Vigil, Vigil, that the best available control measure requirement does not require the implementation of all feasible measures. We're challenging the best available control measure determination here because it was arbitrary and capricious, because included in the options that the sources could select from are measures that are clearly less effective, and the EPA has never demonstrated represent even the single, any of the options represent the best available control measures. So that's argument one. Argument two is that this valley, unlike the situation in Arizona, has missed all of the attainment deadlines. And so now they're required to do more than best available control measures. They're subject to the requirements of 179D2, which now does say that the State plans need to include all feasible measures. Well, let's, if you can, be more specific on that. Let's take an example. Let's take non-paved roads. What do you think that the EPA should have required with respect to non-paved roads? How do you criticize the menu that they have choices? If I could pick a different example that I think would be very clear. Is that okay? Well, no, it's not a change of hypothetical, but I think one example is very stark, and that's wind barriers. So the menu of options includes one option that says you can put in a wind barrier to address, you know, wind-generated dust. And that's it. That's all it says. You check the box, we have a wind barrier. But actually, if you look at the record, and I think it's useful, the district does this analysis. It's in the respondent's excerpts of record at 438, which is under EPA tab 9. They talk about wind barriers, and they go in and explain that the effectiveness of a wind barrier depends on design features like the height, the density, the orientation, and the length of the barriers. But the district, the rule doesn't specify any of those. It just says put in a wind barrier. The district goes on to explain that you can have some wind barriers that achieve 30 percent reduction in wind-generated dust, but if you design it differently, you can achieve 60 to 90 percent reduction in wind-generated dust. But the district doesn't require you, the source, to put on those best wind barriers, or even to demonstrate that those best wind barriers aren't feasible. It just says wind barrier, which could be anything because it's undefined. So at a minimum, the exercise that the agency should have gone through here is to define those options to say, well, what are the best controls within each of those options? And further, they should have gone through and explained some of these options are going to get you much greater reductions, and some are going to get you much less reductions. Are all of these options truly necessary? Do we need to include even these least effective control measures? There's no analysis. Go ahead. All right. So let me start with the approval of the measure as meeting the best available control measure, and this is an arbitrary and capricious, yeah. One other just preliminary question. Yeah. Of the 60 percent of particulate pollution that agriculture in the Central Valley produces, do we have a breakdown in this record of what sources contribute the most? You mean which agricultural sources? Yes. There may be, but I can't pull it off the top of my head. So let me just skip right to why we believe the finding on best available control measures is arbitrary. There's no dispute in this case what the standard is for best available control measures. Those measures have to achieve the maximum degree of emission reductions achievable. EPA offers extended complaints about the complexity of regulating agriculture and the need for flexibility, but none of these arguments amounts to an analysis of what, in fact, the best available control measures are. In the end, EPA provides only conclusory claims that it evaluated BACM, and we know that, in fact, they did not evaluate BACM. First, there's nothing in the record. This Court can scour the Federal Register notices, EPA's technical support document, the district staff paper, and you will not find anywhere an explanation of how any of these options, or even the rule as a whole, why that represents the maximum achievable emission reduction. Second, we know from the record that the criteria that they actually used are not the BACM criteria. This list that was generated here was generated by an ad hoc group led by industry, and that group included on the list any measure that was feasible and found to have minimal impacts on local agriculture. EPA and the district never questioned or did any further analysis on the list that was generated. Those criteria, feasible and minimal impacts on local agriculture, are not the BACM criteria. So we know the criteria that were used to generate the list, and they are not the appropriate ones. And finally, we know that EPA did not conduct a BACM analysis because it's simply not possible. EPA admits in its response brief that it did not know specifically what was required under any of these measures, but they were assuming that those details would be worked out by the district. EPA then has no reasonable basis for concluding that these measures, which are undefined, which EPA doesn't actually know what are required, there's no basis for them to conclude that these represent the maximum achievable emission reductions. Petitioner's second objection is that EPA should have ensured not only that Rule 4550 meet this BACM requirement, but that the rule provide for the implementation of all feasible measures per Section 179.d.2. Petitioners have outlined in their briefs the long history of the San Joaquin Valley's failure to attain or to meet any of the attainment deadlines established in the Clean Air Act. EPA does not dispute that since the valley missed the 2001 deadline for attaining these particulate matter standards, they're now subject to 179.d. That section outlines the consequences of a failure to attain. It allows for up to a 10-year extension of the attainment deadline, which EPA has used here to give the San Joaquin Valley until 2010 to attain, but it also provides that the state plan must be revised, quote, to include, quote, such additional measures as the administrator may reasonably prescribe, including all measures that can feasibly be implemented in the area. There's no dispute in this case that Rule 4550, by allowing sources to choose one of a list of feasible options, does not require the implementation of all feasible measures. The issue here is whether Congress mandated that an area like the valley that has missed all of its attainment deadlines adopt this kitchen sink strategy and adopt all feasible measures, or whether the plan allows EPA the discretion to decide what measures should be included in that plan. This is purely a question of statutory interpretation governed by a Supreme Court's decision in Chevron. And the exercise there, of course, is to discern whether Congress has expressed an intent on this issue. Petitioners have looked at the statutory language, the structure of the Act, and the legislative history. With the statutory language, general rule, this Court must assume that Congress intended every word and clause to have some meaning. Here, the language suggests, first, that Congress meant to specify what control measures would be required. Second, by using the word all, it suggests that Congress meant to remove any choice in the matter. Now all feasible measures are required. Again, it's sort of, we've run out of deadlines, we don't know anymore what can be done. Everything needs to be done. EPA's interpretation here is that all that's required is whatever EPA decides to prescribe. That reads out not only the word all, but the entire clause, because now this Section 179D is effectively, the plan shall include whatever measures the administrator reasonably prescribes. The structure of the Act also suggests that Congress meant to have an escalating, escalating consequences or stringency of controls with the additional time. And the way that the particulate matter provisions work in general shows this pattern fairly clearly. Areas originally or initially designated as moderate, yeah, moderate non-attainment areas, and they're subject to a deadline of 1994, those areas have to implement all reasonably available control measures. If an area, like the Valley, misses that deadline, they're redesignated to serious non-attainment. They're given now to 2001 to attain, but now they have to implement best available control measures. The Clean Air Act further provides that if an area is not going to meet that 2001 deadline, they can ask for an extension of up to five years. In exchange for that extension, though, now they have to implement the most stringent measures that are adopted anywhere in any other state implementation plan. This Court in Association of Irritated Residents held that the San Joaquin Valley, by missing the deadline and not asking for an extension, just missing it, was not subject to the most stringent measure requirement, but instead subject to 179D, which, as I've mentioned, gives this 10-year extension and the consequences outlined in 179D. So it's consistent with this structure to conclude that Congress intended to mandate controls beyond BACM in exchange for allowing more time, but EPA's discretionary approach here would mean the EPA, again, could require whatever it chooses, whatever it believes is reasonable, which theoretically might not even include the best available control measures. Finally, the legislative history on this provision is limited, but it's very clear. The committee report accompanying the House bill where this language originated explained Section 179D SIP revision is to include such additional measures as the administrator prescribes and is to include all measures for reducing emissions that can feasibly be implemented in the area. The standard that applies to areas like the Valley is more than the best available control measure requirement. These areas have to implement all feasible measures because they've run out of time, they've run out of solutions, and Congress, again, meant to throw the kitchen sink. As EPA does not dispute that the rule fails to meet this standard and this result, EPA's approval should be vacated, not just remanded, because there's no possibility that EPA is going to be able to fix this defect with further deliberation. Thank you, Counsel. Thank you. Wait, I have a question about that. What would be the consequence of vacating the EPA's action as distinct from remanding it, and what is our authority to do that? Well, in our briefs we point out examples, Sierra Club. Let's see if I have the others. What's the effect of it? The effect is important, and the effect is the approval is denied, the rule goes back to the district to be rewritten to comply with the court's determination of what's required under the law. Why isn't that the same as a remand? A remand, it goes back to EPA to see if EPA can fix the record. But the problem here is that the rule is defective, and there's nothing that EPA can do. EPA is not the one that wrote the rule. It's the district that wrote the rule and submitted it to EPA for approval. So there's nothing EPA can do, either for the BACM determination, because, as we pointed out, the lack of detail makes it impossible for EPA to say that this rule represents BACM, or to cure this all feasible measure requirement because the rule doesn't require all feasible measures. Thank you, Counselor. Thank you. Do you have a time agreement? Do you have an agreement among yourselves as to how much time? We do, Your Honor. Good morning, Your Honors. I'm Thomas Lorenzen with the U.S. Department of Justice. I'm representing the respondent here, the United States Environmental Protection Agency, with me at Council table today is Jan Taradash of EPA Region 9. Also, I have representatives of the various interveners. I will be ceding five minutes of my 20 minutes to Mr. Philip Jay, who represents the San Joaquin Valley Unified Air Pollution Control District. I think, as Your Honors have correctly realized, and as this Court realized in Visual V11, which I know Judge Graber heard, due to agriculture's extraordinary variability, due to the vagaries of weather and other conditions and the difficult economic constraints that agricultural sources face, regulating agricultural sources of emissions of PM10 is simply one of the most complex tasks that EPA or local air pollution control authorities wrestle with. Why is it impossible? I mean, I come from an agricultural state, and I have a lot of sympathy for economics of agriculture, but a lot of these measures are not rocket science. I mean, we're talking about how often do you spray a road? How often do you manage your feedlot? Those are well, you know, how you manage a feedlot is something that's been, and effectively in a way that doesn't produce pollution, is something that goes back 50 years. Indeed, and no one is suggesting that regulating agricultural sources is impossible. What we are suggesting is that, let me put it this way. Let me put my question another way. Why should there be a difference in the way that one feedlot is managed versus another? If you're trying to find the best available method of controlling dust and particulate emissions from feedlots. Well, it is simply because, Your Honor, as the Court recognized in Vigil, the individual circumstances of a particular feedlot may be quite different than those of another. They are different. But if you go down the checklist, I'm sorry to interrupt, but if you go down the checklist, they're talking about how often you clean out the pens, and that's not, you know, why isn't there a method of saying within a particular subset of the agricultural community that this is the best available method of reducing particulate emission? Well, because there is, again, just so much variability. You know, some may have their manure stored in an enclosed area. Others may be open. Some may be on hill areas that are subject to higher winds. Others may be in flat areas with lower winds. Isn't that why you would build an exceptions to rules? Well, the question is how specific can one possibly get and still create a manageable program that can both be implemented by the farmers and that can be managed by the Air Pollution Control Authority? Well, that doesn't seem logical. If you can put five things on a menu, you can require that all of them be selected rather than one of them be selected. One could certainly require that all of them be selected. However, this Court said in Vigil that you couldn't do that because of the economic constraints on areas. Now, what Mr. Court has argued today is that indeed, you know, they, and this is kind of jumbling the 179D argument and the back argument, and I want to get to 179D later, that indeed they ought to be doing everything. And as the Court recognized in Vigil, that really isn't possible because you very quickly come to the point where it is no longer economically feasible for a farm. Many of which operate on very, very tight margins to do this. And also because what may be feasible for one farm in one location with one type of weather condition is not going to be feasible for another farm with a different size of herd or different physical characteristics to implement. So there needs to be flexibility. What is your response to the argument that the statute is structured in such a way that with repeated extensions of time and repeated nonattainment of the requirements of the statute, that it becomes more and more onerous, and that's Congress's design? It does become more onerous, definitely. However, and I think this is now getting into the 179D argument, and let me just address 179D. And I want to put aside for the moment the fact that I believe the 179D argument is untimely because it was addressed in the 2004 SIP approval, which this Court passed upon and approved in the Association of Irritated Residents case. That issue was not raised, even though EPA addressed it. I believe it's waived here. But let's go to the merits of 179D. First of all, you're talking about the increase in stringency of measures at each step. And I think what happens when an area, yes, first they have to do RACM if they're moderate. If they become serious, they must do BACM, which is a higher level of control. If they fail to attain, the consequences are two. One is they have to achieve 5% reductions per year. That's the consequence. The second consequence is 179D, which says the administrator, the plan shall include such additional measures as the administrator may reasonably require, including all feasible measures. Now, if you interpret 179D the way that Mr. Court would ask you to interpret it, the first part of that provision, which is, I think, a very important part, that the plan shall include such provisions as the administrator may reasonably require, becomes meaningless, because the plan must include everything. And if the plan must include everything that's feasible. You're referring to D2 now? Yes, 179D2. If the plan must include everything, all feasible measures, there is nothing left that the administrator may reasonably prescribe. That last clause swallows the first. There are a whole series of shells. Indeed, there are. And then all of a sudden there's a may. Yes. And you hang your argument on that book, indicating there's a lot more discretion there. Now, tell me just how, in one phrase, the may reasonably prescribed overrules all the shells. Well, it doesn't. It does not. Indeed, the shall is the plan shall include the measures that the administrator reasonably prescribes. And that's the may. And the including all feasible measures, which, by the way, goes on to talk about a whole bunch of things that the administrator may weigh in determining whether something is reasonable, is merely the definition of the outer boundaries of what the administrator may reasonably prescribe. It is not a statement that he must include every single one of those things. If that's the case, then the first portion of 179D2 becomes meaningless. That's the portion that gives the administrator discretion. Well, isn't the discretion limited to determining what measures are feasible, can be feasibly implemented in light of the issues listed, the technology, the costs, and so on and so forth? Yes. And that, I think, takes us. Only limitation, though? I mean, in other words, once the administrator determines that a measure is technologically achievable, has an implementable cost, and doesn't have other health consequences, all the things that are listed there, doesn't that have to be included? No, I don't think it does. Because, again, I think that takes out the language about what the administrator may reasonably prescribe or require. You have to give meaning to both of those two clauses. And I think that the way that the petitioners read it really writes out the first part of it. There are more stringent requirements here. And that is evidenced by the fact that you have to do your 5% annual reductions, and by the fact that, indeed, the plan must contain any other provisions that the administrator reasonably requires. And, again, I think that the last part of that clause, the including all measures that are feasible in light of technological feasibility and costs and environmental and non-environmental effects, is a cavity on what the administrator may prescribe. Well, your reading of it would allow an administrator to say, well, I don't really find anything reasonable. And that would take away from the first part of the sentence. The revision shall include such additional measures, some additional measures. But under your reading, it's really just entirely up to the administrator whether there are measures that the administrator likes. I believe it is to the administrator's discretion to determine what additional measures are necessary under 179d2. Are necessary or only that are feasible? I'm sorry. That he may reasonably prescribe, that he may reasonably require. That is for the administrator to determine. We may be just sort of going round and round with this, but it seems to me that the best reading that I can come up with of this very strange sentence is that it's up to the administrator to reasonably prescribe all measures that can be feasibly implemented and so on, and then those shall be included. Well, no, and in fact, I think that actually leads me to another point. Mr. Cork talked about the legislative history here and noted that there was in one of the reports some language that suggested that the provision really should be read to require both what the administrator may reasonably prescribe and all feasible measures. Now, I note that the language of the statute does not track that anymore. The and is no longer in the original or is no longer in the statute. It is now that, and this is just quoting, the revision shall include such additional measures as the administrator may reasonably prescribe, including all measures that can be feasibly implemented. And I believe that, as Your Honor just recognized, this is a complicated provision. It is not the best worded provision. But what it requires the administrator to do, it seems to me, is to identify all feasible measures that meet the other criteria that are then listed and to include those once identified. Respectfully, Your Honor, I disagree. And, one, I think this debate indicates that this provision is at a very minimum ambiguous. And in light of ambiguity, Chevron instructs that one must defer to the agency's interpretation unless it is an unreasonable interpretation. And I submit that EPA's interpretation of this provision is quite reasonable. Let me clarify this by maybe telling us, when the statute gives the EPA, in addition, the revision shall include such additional measures, what are the additional measures that were included in this plan? Well, the administrator determined here, and I think one, again, has to go back to the 2004 SIPA provision. You're liable to answer more than I need. I'm just trying to get a feel, what has the EPA done under the shall, and what have they done in the plan under the may? Well, the administrator determined, and, Your Honor, let me just turn for a moment to the 2004 SIPA approval, which you will find in the Petitioner's Excerpts of Records. And I refer you to, refer you specifically to page 201 and 202 of the Petitioner's Excerpts of Records, which are the Federal Register Notice approving the 2004 SIP, which this Court upheld in the Association of Irritated Residents case. What EPA said there, it is clear from the plain language of this provision, referring to 179d.2, i.e., the use of the word may rather than shall, that Congress intended the administrator's action here to be permissive rather than mandatory. Under this provision, therefore, EPA has the option to mandate specific additional feasible measures beyond those measures otherwise required in non-attainment areas. EPA is not, however, required to prescribe such measures. So, in other words, the administrator has to first make some sort of determination that additional measures are needed. If he doesn't determine that they're needed and back them, plus the 5% annual reduction in emissions that's required under the statute for an area that didn't attain, is enough, then there is no reason, and indeed it might be unreasonable, to prescribe those additional measures. And again, I My position is that the statute's ambiguous. The EPA has interpreted it reasonably to say that it's sufficient to have back them plus the 5% unless the administrator chooses to do more. That is correct. And indeed, I think that that issue was resolved by EPA in the 2004 SIP approval. It could have been challenged then. It was not. Let's assume that it's being challenged now. Well, I think, Your Honor, I know that it is being challenged now, but it is untimely. The statute, the Clean Air Act, gives a petitioner 60 days from the promulgation of a final rule to raise a challenge. This issue, which EPA believes that 179D, read in its whole and in context, applies at the stage where EPA approves a plan as a whole. That approval occurred in 2004, May 26, 2004. And it is the approval that is in the petitioner's record starting at, pardon me, page 175. The issue was definitively resolved by EPA in that rulemaking. And that issue was not challenged by petitioners in that case, though it could have been, and must, therefore, be deemed to be waived and resolved and untimely at this point. I do not think the Court actually needs to entertain their argument because the opportunity came and went in 2004 to raise this issue. And, really, I think that takes us back to Bakken and the question of whether or not more was required, whether. Well, the lack of specificity is actually fairly stunning to me in this. You have a menu of options that don't really say anything. Basically, it says do your best, hope we get the 5 percent. I don't see, let's take speed limits, for example. One of the options on unpaved roads is to enforce speed limits. Well, what, you know, are you going to set a speed limit? Are you going to enforce it? That, to me, you check it off and say, okay, we're not going to let, that's something that can be measured. It's something that you can debate about. You can say, all right, we want no more than 25 miles an hour on an unpaved road because it creates dust. That's easy. It doesn't depend on wind condition particularly. It doesn't depend on the need or the economy. Those things can be done. And you go down, whether it's a dairy operation or the feedlot operation or even more complicated matters such as almond farming, there are measures that you can see there that one can scientifically examine, one can prescribe that are left completely open. It's hard for me looking down the list to determine what the best available method is and where it's going to be. Well, and I think, Your Honor, that that goes to precisely the difficulty of trying to prescribe something more specific for the agricultural industry, the agricultural sector. Well, you say that, but each of the examples that Judge Thomas has given you is quite simple. It is quite simple at a theoretical level. And as this Court said in the... Well, not at a very practical level. Let's talk about the, there's some measurement that if you have certain speed limits on unpaved roads that you're going to reduce dust. What, I don't understand what's so complicated about determining or saying we're going to put a 25-mile-an-hour limit because we can measure the amount of dust that goes in the air. True. And that doesn't vary whether it's an almond farm. It doesn't vary whether it's on the Harris Ranch up on the I-5, a big operation. Those things don't vary. Well, I... Or the variances are trivial. No, I don't think they are trivial. I think that the individual circumstances of a farm make these variances quite significant depending on the crop you are carrying. For instance, I think... I'm talking about the roads. I'm just talking about specific examples here. Now, if, I mean, if I read a more specific document that said we understand that you might have to do a different, apply a different chemical on an almond farm even, you know, several miles away that might, or a pesticide or whatever. There are differences. I understand this. I understand the economics. But there really are no minimum measures anywhere in the plan. Well, Your Honor, again, I think that is because of the variability of individual farm circumstances. There are situations where a speed limit really may not be the most feasible way of doing things depending on the crop, depending on how quickly you need to get it from the fields to the place where the crops are processed. I think that some farmers may choose not to implement speed limits at all because really the best way for them to do it is by spraying with water or a chemical suppressant to keep dust down or by putting gravel down. And the idea is that we really need to let farmers determine what is the most feasible. And this Court, I think, upheld that principle in a way that I think almost resolves this case in vigil where the Court said we cannot get down into that level of detail. We were not faced with an option where the menu items, or at least the argument was not made that the menu items themselves were too vague and too unspecific to be meaningful. I think the menu items in the vigil case were very similar to the menu items here. What happened there is the Petitioner saw this Court saying no one challenged the individual menu items and they figured that their only way of surviving review here was to challenge it. Well, but my point is you are claiming that we decided that issue and I am just suggesting that maybe we didn't. Well, obviously not directly, but I think the necessary implication of what the Court ruled in the vigil case is that you can't get more detailed than this without basically saying you can't do a menu approach because you must determine which is the most... I don't see why that's even logically true. To go back to your road example, it could say farmers have a choice between laying down gravel and enforcing a speed limit of 20 miles an hour or less. That still gives them a choice, but it's quite specific. But the 20-mile speed limit may not work in all circumstances. I think maybe what I can do, what Mr. Court just did, is I'll change your hypothetical to a slightly different one. Let's take something that he pointed out, which is road width. He notes that the... What about wind barriers? Let's take a common example, the wind barriers. Basically, his argument is you can comply with the wind barrier checkoff by planting a bunch of juniper shrubs that won't do anything about the wind because you aren't specifying any minimums. Well, I don't think you can specify a minimum because what constitutes an appropriate wind barrier will, again, vary quite significantly depending on whether or not your farm is in a canyon, in a valley, on flats. What are the prevailing winds? Are you an area that's subject to the Santa Anas or are you an area that... But you can't just throw up your hands and say it's impossible. I mean, you're basically saying agriculture is so tough we can't even deal with it, and that's not true. I mean, between your two positions, there is a medium of specificity that I find lacking. Now, whether it's failing or not, I don't know, but I'm just surprised that on obvious items where you could have a menu choice of intelligent menus that were scientifically based and said if we do X, we know we'll have certain reductions. If we do Y, we'll have other reductions to choose. There's a level of specificity. Well, again, I see my time is up, but I would like to answer your honest question. We did rely heavily on the process here as an indication that these things had been explored and developed to the degree of specificity that was appropriate, just as in Vigil. Indeed, the Agricultural Technology Committee that was formed here to assess the various types of controls that could feasibly be implemented was almost identical to the committee that was used in Maricopa County to approve that plan, in which this court viewed as a matter of process as giving an indicia of back-up. That committee, like the Maricopa County Committee, included representatives of the Air District, of the California Air Resources Board, farmers, scholars. There is a process by which they evaluated these things and determined how specific they could be while providing the necessary flexibility of forms. Yes, Your Honor, things will be implemented differently on each farm. Agriculture is not like paper mills or power plants where you can identify a one-size-fits-all technology. Every farm is unique, and I don't see, and EPA did not see, and the Air Pollution Control District did not see how you could get more specific than this without effectively making this program too unduly burdensome for the agricultural community to manage, and therefore, an infeasible program. And the limits of back-up have to be feasibility. And with that, I see my time is up. And don't worry, we're going to get to the district. I know he's anxious, but one final question, if you might, and maybe we have a couple of others as well. Do we have anywhere in this record an indication of the source, the breakdown of the source of particular pollution? I just asked my co-counsel that, and I don't know that we do. If we do find something in the record, I would be happy to provide the court with a 28-J letter indicating where it can be found. Okay. Do you have a question? We'd hand it with hand signals. Thank you, Your Honors. Thank you very much for your argument. I appreciate it. Don't worry, Mr. Jay. We're going to give you your full time. It's an important case, and you have some cases. Philip Jay, District Counsel representing the district. Would you put five minutes on the clock, please? I think the exchange I'm seeing here today illustrates why the court should defer to agencies like the district and EPA when examining complex questions such as this. There are approaches. Mr. Court argues a very rigid approach. The court asks questions saying, well, why can't we put a set percentage on this type of practice or not? If you look at the definition of BACM, it says not just the most stringent controls, it's a balancing act. You have to say most stringent controls, balancing things like economics, feasibility, things of that nature. Is there a requirement of specificity inherent in that? I mean, otherwise you can have a list that just says do what's right. I mean, there has to be some level of specificity. There's a continuum here you're arguing over, and you're saying, well, it's good enough to say wind barriers and speed limits without really explaining what they are or how fast they are. And they're saying, you know, you have to specify, you know, 18 miles an hour and such and such, which is very, very specific. But where does it cross the line of being insufficient as a matter of law or arbitrary and capricious? There is a degree of specificity. You've heard about how all the experts got together and came up with the menu of items. What the district did is it went a little farther than what happened in Maricopa County or in the South Coast Air District. You have to pick the item, and then there's an application process where a justification has to be given by the farmer as to why they're picking any particular control. And I know you could argue you could cherry-pick applications like the petitioners have tried to do and say, oh, well, on this application, maybe the guy didn't put enough information down. But the idea is that that detail is at the point where that application is filled out. The farmer says, I'm going to do a windrow, a windbreak, and it's going to be, you know, this high, located in this location. So because, you know, maybe the wind is coming from that particular location, that goes into the application. It's reviewed by the district, approved, and then it becomes enforceable. In the San Joaquin District, that becomes a situation where you could be subject to civil or criminal penalties for not following what you promised to do. Right. But, you know, that would have been terrific before the backroom kicked in. And now you're looking at the best available technology. And I'm really sympathetic to trying to find a solution that works for an individual farmer and rancher. But the menu of options is so vague, it's just impossible for me to see how you could guarantee in any particular situation that the best available technology is being used. I mean, there doesn't seem to be any enforcement mechanism to me that's meaningful. It seems as though it's a series of aspirational goals that please manage your farmer ranch in the best manner to reduce dust. It's a question of approach. One approach could be, yes, let's have a very rigid, you have to do a certain percentage for each area of your farm. What the district did was based on this diversity. We're talking about over 3 million acres of farmland in the San Joaquin Valley. An area of 25,000 square miles where the climate can differ from north to south tremendously. We're talking about over 100 different crop varieties. You've got various options with dairies. So approach-wise what the district did is said, well, rather than try to go through this exercise with 6,000 different farms, why don't we come up with an overall target taken out of the Clean Air Plan that says, okay, we commit to reduce this source category as a whole by 33 tons. And then if the farmers don't come through and do enough to meet that target, the rule gets ratcheted down and maybe the version that gets ratcheted down is one that is more specific on a farm-by-farm basis. But that was not the approach. Take dairies, for example. I mean, there are differences between dairies, but it's a very highly regulated industry. The practices don't differ that much from dairy to dairy in terms of many of these core issues. It's hard for me to see why that couldn't approach with more specificity, just looking as the casual observer as an example. And there are rules in the district that provide that specificity, but that's a different case. What you have is varieties and dairies. We have some dairies that have 20,000 head. Some have maybe a few hundred. You have dozens of different soil varieties in the valley. You might have one dairy where maybe the soil has more moisture. In that situation, that dairy owner might clean up his manure less often because there's not as much dust being created, where someone else might, because of arid soil or whatever, might have to do it more often. Keep in mind also, this is a retrofit situation. A lot of these, in fact, the majority of these facilities are already there. So it might be easy in a new facility to say, well, configure it in a way that you can clean the manure up, you know, twice a day or whatever, but what you're dealing with is a facility that's already there. So there's that variety. Let's take one of the examples that's given, regulating the hours in which these activities can be performed, which seems to have an effect on the ambient air. That doesn't differ a whole lot. It depends. If you have an alfalfa field that's, you know, 200 acres in size, you might not be able to do night harvesting like they can do in other crops. For example, with cotton, due to soil types, there's some cotton growers who can use a certain type of equipment to go through the field once and do three operations. The other guy who's got a more clay-like soil can't do that. That same piece of equipment would get bogged down in the clay. So with all that variety, what the district did was set a target, make the growers fill out their applications. In fact, what the district did, which is something that you don't usually get when you do a rule, is then the district went back and reviewed the 6,000 applications that it had received and did very detailed calculations as to whether the rule was going to get the reductions that were promised. And it did. It exceeded the reductions that were promised in the plan. And so the rule is getting these tremendous reductions to the point where the district attains the standard. Is that a permissible way for us to examine the propriety of the rule, to go back and look after the fact and see how things are going? Don't we have to look at the rule as it sits and the record on which it was originally based? Because even if it said nothing more than, well, gee, let's everybody try, and it was clearly insufficient and if everybody kind of tried and it worked out, I mean, you're saying, well, we don't have to think about what's in the rule because everything's working out okay? Well, that study I'm just illustrating is in the record. I know it is, but what's the relevance of it is what I'm saying. I don't understand why it makes any difference whether things are better now if the rule itself is. It shows that the district's approach works. In the vigil case, the Ninth Circuit said, this exercise is to look at what are the best controls you can put in all things considered. What the district did was took a little different approach and expanded on that menu approach, added more enforceability, but you're dealing with a much bigger problem than they had in Arizona, for example. You're dealing with millions of acres versus a few hundred thousand acres. You're dealing with hundreds of crop varieties versus, I think, eight crop varieties. So we believe that the discretion and this deferential standard of review that the court is required to apply here allows for some flexibility in approaches. Sure, one approach might be to have a very rigid, let's have a case of, you know, let's look at each little area of a dairy and say everybody's got to do the same thing. But we don't think that's what the law is. The law says it's a balancing test and there's a lot of discretion there left to the legislative body to decide how best to deal with what is a difficult problem. The district has an approach. The petitioners have a different approach. Even the court has, there's various approaches to solve this problem. The answer isn't what's necessarily the best approach. It's the approach that complies with the statute. That's what we're, we couldn't second guess you on what's the best approach. I'd be loath to say what's appropriate for one dairy or another dairy or an almond farmer, whether it's an emission standard or an ambient air standard. The question is whether it complies with the statute. That's the only thing. And even this circuit has recognized the statute is ambiguous, this idea of best available control technology. It vests a lot of discretion in the agencies that have to implement this. I think the court said the term exudes ambiguity and invites debate, and that's exactly what we're doing here today. I mean, who's to say what's best? At its core, though, isn't this regulation generally economically based and not environmentally based because the idea is what's affordable for the farmer or rancher? And I'm not saying that's necessarily a bad idea. The question is does that comply with the congressional requirement. Well, the definition that seems to be accepted is you have to consider the economics. It's the best available, the maximum degree of reductions you can get, taking into account economics. Under that definition, a reduction of a percent or two could be considered back home under the law. And here we have a situation where the district has basically exceeded any target. We've got 35 tons per day of reductions from the source. That's 73 percent of what is needed in the plan to achieve the standards. That was taken and compared to the socioeconomic aspect. There's a report the district did to try to figure out how much does this cost as a whole. We agree. We did not take any individual grower or any individual part of a dairy and say, this is what you shall do. The district did a different approach. It took an overall approach and said, as an industry, if you meet this target, that's fine. If you don't, we will ratchet it down until you meet this target. And we contend that the definition of back home and the deference the court exercises and the discretion it gives to the legislative branch allows for that type of a system. Any further questions? Thanks for your time. Thank you. Your Honor, I just discussed with Mr. Court, I know this is just a bit irregular, but I have to address something that Mr. Jay just said that we cannot agree with, even though it might have been helpful to my case. It is not the view of the United States that one can examine the propriety of the rule based on results achieved after the rule is finalized. One has to examine it based on the record developed by the agency prior to promulgation of the rule. Thank you. Thank you, Counsel. But it's still nice to hear you reducing commissions and it's working. Well, let me start with that then and address the best available control measure argument first. Petitioners here aren't advocating a one-size-fits-all solution. We're not saying what needs to be included in that menu. We're saying you need to provide us a rational basis for why you've included the option. And EPA has not. In fact, in the end, their argument is that they follow the same process that they followed in VIGIL. Well, VIGIL cuts a pretty wide swath. I mean, to me, it's an important case. Absent VIGIL, this may be a different case. But VIGIL did approve, albeit I take your distinction, a menu type of approach. And we, again, aren't disputing that you can have a menu. You just need to provide a rational basis for what you're including in that menu. And what we've shown here is that the process that they followed used the wrong criteria. It never evaluated. As you pointed out, it focused on affordability. It focused on minimizing the impacts to ag. And it never addressed the question of whether these options represent the maximum achievable emission reductions. Where I take it that you include that in the word shall that goes through the statute. In that what we've been talking about is the best available control measure requirement. How do you interpret the words may reasonably prescribe? Right. With respect to the 179D2 argument. I asked the question before. I don't think I got an answer. And maybe you can help me. I think that, well, the legislative history suggests that there are two pieces to what's required under 179D2. There's the piece that EPA can prescribe measures that it believes are reasonable. And then there's the all feasible measure requirement that sort of represents the minimum of what needs to be required. Respondents suggest that that reading, which, again, we're not inventing that reading. That's the reading that is provided in the legislative history. And just to clarify, the language is always read the same way. It didn't used to include an and and that's been dropped. It was the same when it was originally drafted. Respondents suggest that we're rooting out that first piece and that it gets swallowed by the all feasible measures. But I think that there are two ways that you can read the statute to provide that meaning. One is the way that I think Judge Graber was suggesting, which is, again, that represents the minimum. It's EPA's responsibility to prescribe those once they've done the analysis and determined what's feasible. The other way, I think, is that there are measures beyond those that are based on technology, things like fees or transportation control measures, other things that where a technological feasibility analysis wouldn't be relevant. Counsel, I have a, I know you're out of time, but this is, I think, an important issue for our analysis in the case. The EPA's interpretation of 179D2 came in 2004, and that interpretation was not challenged at that time. Why isn't that the end of the matter? Because the revision does not purport to alter that statutory interpretation piece. It does something entirely different, and, of course, you have the opportunity to challenge in general. But why isn't it too late to go back to the statutory interpretation question, which was laid to rest several years ago? Because I think the timeliness issue assumes that this is discretionary. No, no, I'm not assuming that the, for the purpose of my question, you can even assume that the EPA is wrong. That's not the point of the question. But the EPA stated in writing in 2004, here is our interpretation of the statute, and you didn't challenge it until a number of years later in connection with something that didn't alter that interpretation. Right. It's just a timeliness question that I'm asking you, not a substance question. Right. Well, we weren't faced with the question of whether they had violated that provision or not when they approved the 2004. So let me just pose it a slightly different way. Let's say that you had commented back in 2004, this is a crazy way to interpret the statute. We just don't agree with this at all. It should be this, this, this, and this. And they had responded, no, it's because of this history and that wording and the ambiguity, and that's where we are. Could you not have challenged it at that time? Or even if you couldn't have challenged it until now, at least you would have laid the groundwork for doing so? Right. I don't think we were injured, petitioners were injured by the interpretation at the time, because we weren't faced with a rule like this. At that time in 2004, EPA had said, you know, we'll deal with controlling agriculture and sort of, you know, what we found out would be this menu approach later. And they deferred that part of the plan. But they told you what they thought of the statute, and it's your position that you would have had no opportunity to challenge that interpretation? Again, theoretically we could have, but I don't know why we would have, because at the time it wasn't relevant, it wasn't, you know, injuring petitioners. It hadn't been applied in a way that it is now where it's used to justify, you know, selection of, you know, one of many feasible measures. Okay. Thanks. Thank you, counsel. Thank all of you for your arguments and for building on questions. It was very well briefed and presented. And with that, the case will be submitted for decision. Thank you.
judges: Wallace, Thomas, Graber